Jones, J.
The allegations contained in the petition of the plaintiffs naturally lead the mind to the conclusion that the defendant held a large trust fund, but obstinately and without cause refused to apply the income accrued from the fund to the legitimate purpose of the trust, so that the beneficaries of the trust were by reason of such obstinate and unlawful refusal now starving and homeless, and so obliged to come into court to compel the trustee to perform the duties imposed on him by the trust.
The affidavit of the defendant dispelled this idea, and showed that instead of having harshly and unfeelingly refused, without cause, to apply according to the provisions of his trust the income of the trust fund to the support of the beneficiaries, he has under the pressure of importunities by one of the petitioners, advanced for the support of the petitioners almost not only the whole amount of the accrued income, but also the whole amount of the principal of the fund, and at least an additional sum of $4000 of his own money. The facts in the case show that the defendant’s conduct, instead of being such as should subject him to the strictures insinuated in the petition, was that of a generous nature, operated on by the importunities of a woman. His conduct was not strictly legal, but it was *185 consistent with very natural and honorable feelings, and not actuated by motives of dishonesty. It may be urged that he should have continued to act generously, and make advances; but there is a limit even to generosity, and I think that limit had been reached. The defendant, after having exhausted the trust fund, and advanced at least $4000 out of his own pocket, was constantly called upon to make more advances; but when the persons to whom he had made the advances, sought to make him liable over again by reason of his dereliction from the strict line of legal duty and re-apply to their future use that trust fund of $13,403.93, which he had already applied to their use, I cannot consider him as morally much to blame for refusing to make further advances which the petitioners would not have allowed him, on account of this sum which they sought to hold him liable to pay over again.
It may be suggested that the defendant, in making these liberal advances, was morally culpable, because in doing so he induced, in the minds of the petitioners, the belief that they were entitled to a larger property than they really owned, and thus led them to live in a way, and make expenditures commensurate with such belief. The petitioners could hardly make such a suggestion, in face of their allegation in the petition that he strove to make them believe that they had no property, but were objects of his bounty. There is, however, a further answer to the suggestion. It can hardly be supposed that a wife would not be aware of the ante-nuptial settlement made for her benefit, and the amount of it; and the proof in this case shows, to my mind, that Mrs. Been had such knowledge. Although women are not generally credited with the possession of much financial ability, yet any woman of ordinary intelligence must surely know that the interest of $15,000 will not justify a yearly expenditure of $5000 or $3000, or $2000, or even $1200; and that when she makes *186 such expenditures she is impairing the capital. I conclude, therefore, that in this case Mrs. Been knew she was exhausting the capital, and was not led to the belief that she and her children were entitled to any larger property than the fund which she knew to have been settled on her and them.
It does not appear to what purposes the money was applied by Mrs. Been. We must, therefore, be content to assume that it was mostly applied, as was natural, to give her children that health and education which would fit them to become useful members of society, and earn by means thereof, not only a livelihood, but a competency. This undoubtedly was a paramount object; and the application of the principal of a trust fund to such purpose, (when there are no remainders over,) has been sanctioned by the court of chancery, as eminently proper.
I have deemed it necessary to make these observations upon the facts as presented by the petition, and the defendant’s affidavit, before passing to the legal points.
The petitioners’ counsel, on the argument, abandoned the theory of the petition, and founded his argument upon the facts admitted by the defendant’s affidavit; to wit, the declaration of trust, its provisions, and the facts that the capital of the fund had been broken in on and exhausted for the support and maintenance of the petitioners without an order of court, authorizing it; that the trust fund had never been kept separate from the defendant’s own funds, and had never been kept invested ; that the defendant had ceased making payments to the petitioners; and that the petitioners were without the present means of subsistence.
The motion made in behalf of the petitioners may be divided into two branches :
1. To have the corpus of the fund paid into court.
2. To have an allowance made by the court out of the corpus, for the support and maintainance of the petitioners.
*187 It will be more convenient to consider the second branch first.
In the argument of this branch, the petitioners’ counsel claimed that as the defendant had, without the consent of a court of competent jurisdiction, broken in upon and exhausted the corpus of the fund, the court must regard him as still holding the fund, and the fund being in existence has power to break in on it for the maintenance and support of the petitioners. The defendant’s counsel claimed that if the corpus was broken in upon, for purposes to which the court would have lent its sanction, it will now ratify the voluntary act of the defendant, and that consequently, before it can be known how much of the corpus still remains, it is necessary there should be an accounting to ascertain to what extent the court would have authorized the breaking in on it.
In the view which I have taken of the case, the whole corpus must be regarded as still in existence, for the reason that no court has jurisdiction to authorize the breaking in on it. This view disposes of the claim of the defendant for an accounting.. For if the court has not authority to authorize such breaking in, it has no right to ratify the act of the trustee-in so doing. It likewise disposes of the claim of the petitioners to have the court make an allowance out of the corpus.
I have come to this view upon the authority of two cases decided by Chancellor Walworth, in the late court of' chancery. (Matter of Davison, 6 Paige, 136.) In the matter of Ryder, (11 id. 185,) cited with approbation in The matter of Turner, (10 Barb. 552, 557.) These cases hold that where a fund or estate is given to an infant, with a valid limitation over upon the death of such infant, the court has no power to break in on the corpus of the gift for the support, maintenance or advancement of the infant.
In the matter of Ryder, an infant, (supra,) the grand *188 mother of the petitioner, by her will, gave to the mother of the petitioner the rents and profits and income of her real and personal estate, with remainder to her surviving children and to the issue of such as should have died, leaving issue at her death. The court held that even with the consent of the mother they could not appropriate any part of the capital of the fund to the support and maintenance of her children; saying, among other things, “the children have only a contingent interest, and such of the children as may happen to die in the lifetime of their mother will have no right to the estate, even if they should leave issue; for the estate in that event is given to their issue, and not to them. It is impossible to say that either of the children now in existence will ever be entitled to any part of the capital.”
These remarks apply with great pertinency to the case at bar. Here, the interest of the infants is contingent on their arriving at twenty-one years of age. Such of them as die before coming of age, leaving lawful issue, have no right to the estate; for, in that event, the estate is given to their issue, and not to them. It is impossible to say that either of the infants will ever be entitled to any part of the capital; for if they should both die under twenty-one years of age, leaving issue, the estate would go to their issue; if both should so die, leaving no lawful issue, the estate goes to the right heirs of the creator of the trust.
Even if I had doubts of the soundness of these decisions, (which I'have not,) still, at special term, I would be bound to follow them, until they are reversed either by the Court of Appeals or by a general term of this court, or of the Supreme Court.
Upon the first branch of the motion, the trustee, therefore, must be declared to have in his possession the capital of the fund, amounting to $13,403.93. And it must also *189 be declared that the court has no authority to make any allowance out of the capital of the fund, to the petitioners, for their support and maintenance.
There is no proof now before me to charge the trustee with the difference between $14,821.85 and $13,403.93.
There is no income which the court can direct to be paid; for all the income which has, or by possibility could have accrued, up to this time, has been applied by the trustee according to the trust.
"With reference to the second branch of the motion, that must depend upon whether there is sufficient cause for the removal of the trustee. This is among the issues of fact to be tried, and I do not propose to outstrip the trial; but it seems to me that under the circumstances there is sufficient cause to induce the court to take charge of the fund during litigation.
The defendant has neglected to keep the fund invested, as directed by the trust, mingled it with his own funds, and used it, and claims to have appropriated the whole of it in a manner not authorized, although for the benefit of the cestuis que trust, blow, although this was done by the defendant through a want of a proper understanding of his duty, and with a good intent, and not through dishonesty or want of fidelity, yet one who has so failed properly to understand his duties, and by reason of such failure has exposed the fund to the hazard of being lost by his insolvency, has in fact allowed the corpus to be eaten up, and keeps the fund still exposed to hazard of loss by reason of business vicissitudes, and also exposed to entangling litigation in case of his decease, should not be retained as trustee.
I am aware that Hill, in his work on Trustees, page 202, (192,) says : “ A failure by a trustee in discharging the duties of his office from mistaking, or misunderstanding his duty, will not of itself be a sufficient ground for remov *190 ing him.” In support of this he cites Attorney General v. Coopers’ Comp. (19 Vesey, 192.) But Judge Story, in his work on Equity Jurisprudence, (vol. 2, § 1289,) gives a somewhat different exposition to the case in Vesey. In his view of that case all that it. decides is that “It is not every mistake or neglect of duty, or inaccuracy of conduct of trustees which will induce courts of equity to remove them.” But, in the language of Judge Story, “such acts or omissions must be such as to endanger the trust property or to show * * * a want of proper capacity to execute the duties, or * ,*
On this branch of the motion, I think the defendant must pay the principal of the trust fund to the extent of $13,403.93 into court to abide this litigation, and subject to the further order of the court.
I regret to be obliged to come to this conclusion. It operates harshly on the defendant, and the petitioners’ counsel will probably claim that it operates harshly on them. But the law is clear, and it is better for the courts to administer the law as settled than to endeavor to subvert it to meet sporadic cases of hardship arising out of violations of it.
Let an order be settled conformably to this opinion, on two days’ notice.